No. 120,359

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of C.S.

SYLLABUS BY THE COURT

1.

The United States and Kansas Constitutions provide substantive protection for a parent when he or she has assumed parental duties. But when a parent has not accepted some measure of responsibility for his or her child's future, the law will not protect that parent's mere biological relationship with the child.

2.

The responsibility to support a person's child does not commence at birth. A father has an affirmative duty under Kansas law to provide support to the pregnant mother.

3.

Kansas adoption statutes allow a district court to terminate a father's parental rights when the father, "after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." K.S.A. 2018 Supp. 59-2136(h)(1)(D).

4.

The party seeking to terminate a person's parental rights has the burden of proving by clear and convincing evidence that termination is appropriate under K.S.A. 2018 Supp. 59-2136. Clear and convincing evidence is a standard of proof—or confidence in the facts—sufficient for a fact-finder to believe that the truth of the facts asserted is highly probable. Appellate courts reviewing a termination decision must determine

whether, after reviewing all the evidence in the light most favorable to the prevailing party, a rational fact-finder could have found the determination to be highly probable.

5.

K.S.A. 2018 Supp. 59-2136 draws no distinction between parents who are minors and parents who are over the age of 18 when establishing the parameters of a district court's analysis. Instead, K.S.A. 2018 Supp. 59-2136(h)(2)(A) directs a court faced with a petition to terminate a person's parental rights to "consider all of the relevant surrounding circumstances"—including, *inter alia*, his or her age, earning power, and any support the person provided.

6.

An appellate court does not reweigh conflicting evidence, reassess witnesses' credibility, or redetermine questions of fact.

7.

When a court concludes it is appropriate to terminate a person's parental rights under K.S.A. 2018 Supp. 59-2136(h)(1)(D), it need not consider whether termination would have been warranted under a different circumstance listed in K.S.A. 2018 Supp. 59-2136(h)(1).

Appeal from Shawnee District Court; EVELYN Z. WILSON, judge. Opinion filed October 4, 2019. Affirmed.

*Mark Works*, of Topeka, for appellant natural father.

*Austin K. Vincent*, of Topeka, for appellees adoptive parents.

Before ARNOLD-BURGER, C.J., BRUNS and WARNER, JJ.

WARNER, J.:  Under Kansas law, the parental rights of a natural father opposing an adoption can be terminated if the parties seeking the termination prove by clear and convincing evidence that the father, "after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." K.S.A. 2018 Supp. 59-2136(h)(1)(D). At issue here is whether a father who was a minor at the start of a pregnancy but turned 18 before the child's birth provided support for the pregnant mother within the meaning of this statute.

In March 2018, prospective adoptive parents petitioned the district court for temporary custody and eventual adoption of C.S., a child born in December 2017. C.S.'s Mother was 16 years old when she gave birth; C.S.'s Father turned 18 years old five months into the pregnancy. Mother consented to the adoption, but Father did not. The prospective adoptive parents therefore sought to terminate Father's parental rights, alleging he failed to support Mother during the pregnancy and after C.S.'s birth. After an evidentiary hearing where the district court heard testimony from numerous witnesses—including Mother and Father—the court concluded Father had not provided meaningful support to Mother during the six months before C.S.'s birth, granted the petition, and terminated Father's parental rights.

Father appeals, arguing that the district court should have analyzed the evidence differently since Father was a minor for a portion of the pregnancy. Father also argues that the district court did not give proper weight to his support efforts, especially because Mother's family moved her to Florida to live with a relative during the last two months of the pregnancy. We conclude the district court analyzed the evidence under the correct statutory framework and the district court's factual findings are supported by the record. As an appellate court, we do not second-guess the district court's credibility assessments or reweigh the evidence. Thus, we affirm the district court's termination of Father's parental rights.

FACTUAL BACKGROUND

Father met Mother in late August 2016 while he was 17 years old and a senior in high school. Mother had recently turned 15 years old. Father and Mother became friends that fall and began to be sexually active in early 2017. In March 2017, Mother became pregnant—a fact she and Father learned in May or June 2017. Father was aware throughout the pregnancy and after the child's birth that he was the child's father.

Mother's parents were divorced. Though she had previously lived with her mom, that relationship was strained. Thus, in April 2017, she moved in with her dad, where she continued to live until October 2017. Father lived with his mom throughout the pregnancy and after the child's birth.

In the summer after she learned she was pregnant, Mother spent most of her waking hours at Father's mom's home with Father. During this time, Mother and Father would watch television, play video games, and have sex, sometimes more than once per day. Mother would eat meals at the house (the food having been purchased by Father's mom). As her pregnancy progressed, Father lent Mother his clothes to wear.

At the evidentiary hearing before the district court, Father and Mother offered divergent explanations of the time Mother spent with Father during that summer. Father described Mother as essentially living with him every day from 7:00 in the morning until 9:00 at night, where he and his mom would provide Mother food and shelter, and where he provided her clothing. Father testified that he applied for a number of jobs during that timeframe, but he did not receive any job offers and thus could not provide monetary support.

Mother painted a different picture through her testimony of her time at Father's house—that she spent her days there as a result of Father's efforts to control her actions,

to hide the pregnancy from her family, and to prevent her from receiving prenatal care. For example, Mother testified that Father believed it was his right to tell Mother's parents she was pregnant and forbade her from telling her mom or dad anything about it. Father did not tell Mother's parents, however, and she eventually told her dad in late September 2017, seven months into the pregnancy. Mother also testified that Father tried to stop her from consulting doctors about the pregnancy. In one instance, Mother had scheduled a sonogram but Father made her cancel it, saying he thought the sonogram would hurt the baby's ears. Father also told Mother that she should not take prenatal vitamins because they would not help. According to Mother, Father wanted her to stay in her room as much as possible and to give birth in her bedroom without assistance.

After Father directed Mother to cancel the sonogram appointment and would not allow her to leave his house, her dad called the police, and the police removed her from Father's home. Mother then went to live with the prospective adoptive parents—the petitioners, who were relatives of Mother's sister-in-law—for about three weeks. But because her family was concerned about her continued interactions with Father and his potential reaction if he eventually learned that Mother was now receiving prenatal care, Mother moved to Florida in late October 2017 to spend the last six weeks of the pregnancy with her half-sister's family.

Mother testified that she asked Father to support her during and after the pregnancy. During the summer of 2017, Father told Mother that he was working on getting a job so that he could provide support. Father testified that he was unsuccessful in his job search until he was hired by Dillons in October 2017. Father testified that he had sometimes worked for his uncle. He also testified that he owned a lawn mower but did not mow neighborhood lawns. Mother testified that Father would apply for a job but not follow up with the application process. He did not provide Mother any monetary support during her pregnancy.

Mother did testify that Father's mom was kind to her and attempted to help her receive medical care after she learned of the pregnancy. But all such efforts had to be done without Father's knowledge.

Father testified that after he got his job at Dillons in October 2017 and before Mother moved to Florida—a period of a few weeks—he would sometimes buy Mother lunch. Father also gave Mother two phone cards so that he could communicate with her when she moved, and either Father or his mom gave Mother a used Fitbit watch. After Mother moved to Florida, Father continued to work but did not provide any support to Mother, either personally in Florida or through her dad, who continued to live in Kansas. He did not seek to find out Mother's Florida address until after C.S.'s birth. When he did ask for her address, Mother provided it to him.

Several witnesses testified that Father was verbally abusive toward Mother during her pregnancy. Father told Mother that if she went to Florida she would be killing the baby. He threatened to kill himself if Mother did not do what he wanted and threatened to hurt Mother and her cat. He called Mother derogatory names and told her to kill herself. On at least one occasion, Father insinuated that Mother had to talk to him because he had purchased prepaid minutes and data for her phone. Father also pressured Mother to stay in her room in Florida unless she needed to eat or use the bathroom; he wanted Mother to give birth by herself in her bedroom. Many of these communications were made through Facebook Messenger or through text messages, with screenshots provided as evidence to the district court. Mother's half-sister saw some of the messages and convinced Mother to block Father's ability to communicate with her in late November 2017.

C.S. was born in December 2017. At the time of the birth, Mother experienced complications arising from a severe iron deficiency, which her doctors had attempted but were unable to correct during the last two months of the pregnancy when she began

6

receiving medical care. C.S. initially lived with Mother in Florida. Since March 2018 and the filing of this action, C.S. has lived with the petitioners.

When the prospective adoptive parents initially filed this petition, Father requested a paternity test, though he had never before questioned that he was C.S.'s dad. Upon receiving the results of that test confirming his biological parentage, the district court held an evidentiary hearing to assess Father's support during and after the pregnancy. At the end of the hearing, the court took the case under advisement. The district court later issued a written decision terminating Father's parental rights under K.S.A. 2018 Supp. 59-2136(h)(1)(D), concluding Father had not provided support—financial or emotional— during the last six months of Mother's pregnancy.

The court found Father's financial support to be negligible, consisting of a used Fitbit, a couple of phone cards, and some fast food lunches. In reaching this conclusion, the court found that "[Father] does not get credit for what his mother provided to both [Father] and [Mother] during the time they spent at his mother's home." The court also found that over the summer of 2017, Father "could have found something to do for money, but he didn't." The court explained that "[t]hough he was young—he turned 18 in August[—]he could have offered to mow lawns, or do other odd jobs to earn money until one of his applications for employment came to fruition." And "[w]hile [Mother] was in Florida," Father was working and "could have sent money to her, or to her parents, as he knew where they all were."

The court also found that Father had not provided healthy emotional support to Mother, observing that his communications during the pregnancy were "even more troubling, even alarming, controlling, upsetting, and threatening." The court found that Father "actually made [Mother's] life more difficult than it would have been if [he] had ignored [Mother]."

Based on these findings, the district court concluded by "clear and convincing evidence . . . that [the petitioners] proved all the requirements for termination of [Father's] parental rights" under K.S.A. 2018 Supp. 59-2136(h)(1)(D). Father appeals.

DISCUSSION

Father argues in this appeal that the district court erred in terminating his parental rights, asserting he provided Mother adequate support in the period before C.S.'s birth—especially considering that he was under the age of 18 during a portion of the pregnancy. To account for his youth, Father urged this court to find that a different analysis should apply when a court is faced with a petition to terminate a minor's parental rights. Father also argues that the district court did not properly weigh the evidence.

The United States and Kansas Constitutions provide substantive protection for a parent when he or she has assumed parental duties. *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018); *In re Adoption of G.L.V.*, 286 Kan. 1034, 1060, 190 P.3d 245 (2008). For this reason, adoption statutes are "strictly construed in favor of maintaining the natural parents' rights when it is claimed consent to adoption is not required by reason of a parent's failure to fulfill statutory parental obligations." *In re Adoption of C.L.*, 308 Kan. at 1279. Conversely, when a parent has not accepted some measure of responsibility for his or her child's future, the law will not protect that parent's mere biological relationship with the child. *In re Adoption of G.L.V.*, 286 Kan. at 1060.

The responsibility to support a child does not commence at birth. Rather, a father has an affirmative duty under Kansas law to provide support to the pregnant mother. See *In re Adoption of M.D.K.*, 30 Kan. App. 2d 1176, 1180, 58 P.3d 745 (2002). Kansas adoption statutes therefore allow a district court to terminate a father's parental rights when the father, "after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth."

8

K.S.A. 2018 Supp. 59-2136(h)(1)(D). In making such a determination, the district court "[s]hall consider all of the relevant surrounding circumstances" and "may disregard incidental visitations, contacts, communications or contributions." K.S.A. 2018 Supp. 59-2136(h)(2)(A), (B). Accord *In re Adoption of Baby Girl P.*, 291 Kan. 424, 434, 242 P.3d 1168 (2010) (quoting *In re Adoption of McMullen*, 236 Kan. 348, Syl. ¶ 1, 691 P.2d 17 [1984]) (defining "incidental" as "'casual, of minor importance, insignificant, and of little consequence'").

K.S.A. 2018 Supp. 59-2136(h)(4) defines support as "monetary or non-monetary assistance that is reflected in specific and significant acts and sustained over the applicable period." Thus, a father need not provide total support to the pregnant mother in order to meet his obligations under Kansas law, but the support must have been of some consequence and reasonable under all the circumstances. *In re M.R.C.*, 42 Kan. App. 2d 772, 777, 217 P.3d 50 (2009).

The party seeking to terminate a person's parental rights has the burden of proving by clear and convincing evidence that termination is appropriate under K.S.A. 2018 Supp. 59-2136. *In re Adoption of Baby Girl P.*, 291 Kan. at 430; see K.S.A. 2018 Supp. 59-2136(h)(1). Clear and convincing evidence is a standard of proof—or confidence in the facts—sufficient for a fact-finder to believe "that the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008); see *In re Adoption of C.L.*, 308 Kan. at 1279. An appellate court reviewing such a finding does not reweigh conflicting evidence, reassess witnesses' credibility, or redetermine questions of fact. 308 Kan. at 1279. Rather, we must determine whether, after reviewing all the evidence in the light most favorable to the prevailing party, "'a rational factfinder could have found the determination to be highly probable.'" 308 Kan. at 1279 (quoting *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4). Questions relating to the interpretation of adoption statutes, however, are reviewed de novo. See *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

1. *Kansas does not apply a different analysis to a natural father under 18 years old to determine whether he has supported the mother during pregnancy, but instead directs courts to consider all relevant circumstances when assessing the father's efforts—including his age.*

Father argues that the district court erred in terminating his parental rights because, he asserts, the court's analysis of the evidence did not give sufficient weight to Father's age during Mother's pregnancy. Father was 17 years old at the beginning of the pregnancy; he turned 18 in August 2017, roughly five months into the pregnancy and four months before C.S.'s birth. This means Father was a minor for two of the last six months of the pregnancy—the period of time relevant under K.S.A. 2018 Supp. 59-2136(h)(1)(D).

At oral argument, Father argued that it was not proper to hold minor fathers to the same expectations of support as adults, opining that a different analysis should apply when a court is considering whether to terminate a minor's parental rights. Father does not offer any caselaw or statutory law for this position, but argues as a practical matter that a minor father may have a limited ability to support a pregnant mother because he may be in school or have diminished earning power.

As a preliminary matter, we question whether merely raising this issue at argument, without providing analysis and legal support, is sufficient to raise this issue on appeal. Accord *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015) (failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief an issue). And we note that this case is not the ideal vehicle for analyzing the level of support a minor father must provide to a pregnant mother, as Father was a legal adult for most of K.S.A. 2018 Supp. 59-2136(h)(1)(D)'s look-back period and was 18 when C.S. was born.

10

Nevertheless, K.S.A. 2018 Supp. 59-2136 draws no distinction between parents who are minors and parents who are over the age of 18 when establishing the parameters of a district court's analysis of whether to terminate a person's parental rights. Instead, K.S.A. 2018 Supp. 59-2136(h)(2)(A) directs a court faced with a petition to terminate a person's parental rights to "consider all of the relevant circumstances." The district court did so here, considering Father's age throughout the pregnancy as one of the factors it weighed in determining whether Father took reasonable steps to support Mother throughout the last six months of her pregnancy.

The absence of any such distinction is telling, as the Kansas Parentage Act sets forth procedures when a proceeding involves one or more minor parents. E.g., K.S.A. 2018 Supp. 23-2211 (allowing for appointment of a guardian ad litem for a minor parent). And Father's argument is belied by Kansas caselaw, which historically has recognized a responsibility of minor parents even younger than Father to provide support for their children. Accord *State ex rel. Hermesmann v. Seyer*, 252 Kan. 646, 847 P.2d 1273 (1993) (affirming district court's decision ordering 13-year-old father to pay $50 per month in child support). Indeed, the Kansas Supreme Court in *Hermesmann* observed that "[i]f the legislature had wanted to exclude minor parents from responsibility for support, it could easily have done so." 252 Kan at 652. The same could be said here—if the Kansas Legislature had wanted a different analysis to govern the support obligations of minor parents in proceedings involving the termination of parental rights, it could have drawn that distinction. But it did not.

In a similar vein, Father argues that the district court erred when it found that the support Father's mom provided to Mother would not be considered as support from Father. At the hearing, the court heard testimony that Father's mom assisted Mother by, *inter alia*, buying groceries that Father and Mother ate during the summer of 2017, allowing Mother to spend her days at the mom's house, buying some clothes as a birthday

11

present, and covertly taking Mother to a sonogram appointment after Father had forced Mother to cancel her original appointment. Before Mother moved to Florida, Father's mom also agreed to care for the child after birth if anyone tried to take the child away without Mother's consent.

After hearing the evidence, the district court found that Father "does not get credit for what his mother provided to both [Father] and [Mother] during the time they spent at his mother's home." We note that the district court's statement, taken out of context, could be troublesome in some circumstances. After all, the law recognizes various circumstances where a minor's parent may act as the minor's agent. See, e.g., *Hermesmann*, 252 Kan. 646 (where minor father's parents were the named parties in the child support proceeding against the father).

We do not read the court's statement here as a citation to a general rule, however, but rather as a factual finding that the evidence *in this case* does not warrant interpreting the support provided by Father's mom as support provided by Father. This finding is supported by the record. There was evidence before the district court showing that at least some of the efforts by Father's mom were made necessary because of Father's efforts to prevent Mother from receiving prenatal care. And while it is true Mother spent many hours at Father's mom's house during three of the last six months of her pregnancy, there was evidence before the court demonstrating that this was not so much an indication of Father's (or his mom's) support, but of Father's efforts to control Mother, to hide her pregnancy from Mother's parents, and to prevent Mother from seeking medical care.

The facts in this case illustrate the wisdom of providing a district court the flexibility to consider all the relevant evidence when faced with a petition to terminate a person's parental rights, rather than compartmentalizing that analysis based on one factor (such as age). Father's status as a youth did not absolve him of his obligation to support Mother during her pregnancy, and the district court properly considered all the

surrounding circumstances in analyzing Father's ability and efforts to provide support—including Father's age, earning power, and all steps he took to support Mother, emotional and financial. See K.S.A. 2018 Supp. 59-2136(h)(2)(A).

2. *Review of the record in the light most favorable to the prevailing party demonstrates the district court's findings were made by clear and convincing evidence. Appellate courts do not reassess witnesses' credibility or reweigh the evidence.*

Father also argues that the district court erred in its assessment of the evidence, emphasizing on appeal the amount of time Mother spent at his home during the summer of 2017 and asserting that his efforts to support Mother were thwarted after Mother's family moved her to Florida during the last two months of the pregnancy.

It is not the role of an appellate court to reweigh the evidence or reevaluate a district court's credibility assessments. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). Rather, we review the evidence in the light most favorable to the prevailing party in order to determine whether a rational fact-finder could have concluded the veracity of that evidence was highly probable. *In re Adoption of C.L.*, 308 Kan. at 1279; *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. We conclude the evidence before the district court meets this benchmark.

Father offers one explanation of his conduct during the summer of 2017, describing Mother as essentially living with him at his mom's house, where his family would provide Mother with food and shelter and where he provided her clothes when she outgrew hers as the pregnancy progressed. This is one interpretation of the testimony presented at the evidentiary hearing, but it is not the only view supported by the record. Nor is it the interpretation the district court found credible.

13

Mother told a different story in her testimony—depicting Father's efforts during the summer of 2017 as efforts to limit her contact with her family and prevent anyone other than Mother and Father from learning about the pregnancy. Father would not allow Mother to tell her parents she was pregnant or to seek medical care. He would not allow her to leave the house and gave her baggy clothes in an effort to hide her pregnancy. Mother would spend virtually all waking hours at his house, and Father encouraged Mother to isolate herself from her friends and family. The district court appears to have found this testimony compelling, and we will not second-guess that credibility assessment.

Father also argues that the district court's analysis was skewed because the court failed to take into account his assertion that his efforts to support Mother were thwarted when Mother's family moved her to Florida in late October 2017. Father compares his situation to the facts in *In re Adoption of C.L.*, where the Kansas Supreme Court reversed a district court's termination of a natural father's parental rights when the adoption petitioners consciously blocked the father's efforts to support his child and play an active role in his child's life.

The *In re Adoption of C.L.* court, however, recognized that the circumstances in that case were "unique." 308 Kan. at 1282. There, the father was unaware of mother's pregnancy until after the child was born and only learned of the birth when a third party called him and asked him to relinquish his parental rights. 308 Kan. at 1282. The people seeking to adopt the child refused to let the father see the baby or tell the father who the mother was, and they initiated a "race to the courthouse" to file their adoption petition before the father could file an action for a declaration of his parental rights. 308 Kan. at 1283. The Kansas Supreme Court described these efforts as "calculated obstructions" to prevent the father from assuming the role of parent. 308 Kan. at 1284.

14

Here, Father was aware of the pregnancy from as early as May or June 2017—nearly as early as Mother was. Mother lived in Kansas for all but the last six weeks of the pregnancy, at which time she moved to Florida. Father was aware that Mother was moving to Florida to live with her half-sister. He and Mother exchanged electronic messages right before Mother boarded the plane, and he continued to remain in contact with her until late November 2017 when his abusive messages caused Mother to block communications from him. Yet though they communicated frequently, Father did not ask for Mother's address and did not take steps to provide any financial support to aid her. While Mother's family was concerned with Father's controlling influences and thus removed Mother from Kansas and later encouraged Mother to block his electronic messages, this case does not rise to the level of calculated obstruction in *In re Adoption of C.L.*

Moreover, *In re Adoption of C.L.* observed that in the "typical case," a father must make "reasonable efforts to support" his child—or here, the pregnant mother—and these efforts include an obligation to "create alternative mechanisms to provide financial or material support through third parties," if necessary. 308 Kan. at 1282. Though Mother's dad lived in Topeka throughout the pregnancy and Father knew where he lived, and though Father was employed from October 2017 until C.S. was born, Father made no effort to contact Mother's dad or send financial or other tangible support to Mother through him. In short, this case is devoid of the "unique circumstances" present in *In re Adoption of C.L.*, 308 Kan. at 1283.

Instead, the facts of the instant case are more akin to the circumstances in *In re Adoption of M.D.K.* There, the natural father learned of the mother's pregnancy in the second or third month of gestation. 30 Kan. App. 2d at 1176. The mother and father broke up shortly thereafter, and mother lived with her parents throughout most of the pregnancy. The father would call the mother about once a month, but roughly a month before the child was born, the mother told the father to stop calling. 30 Kan. App. 2d at

15

1176. The father encouraged his parents to buy the mother's car from her, in a stated effort to eliminate her debt, and provided her with blankets and a picture frame. During the last six months of the mother's pregnancy, the father had three jobs. Yet he did not provide any monetary support to the mother until five months after the child's birth. 30 Kan. App. 2d at 1177. The district court terminated the father's parental rights, finding that he did not provide support to the mother before the child's birth. 30 Kan. App. 2d at 1177.

On appeal, M.D.K.'s father argued the district court erred, in part, because the best he could do to provide support was to request assistance from his parents, which they provided in the purchase of the mother's car. This court disagreed, however, noting the father worked during the pregnancy and could have provided support "at least at a minimal level and did not." 30 Kan. App. 2d at 1180. The fact that the father's parents provided some support to the mother was not enough to show that the father supported her during the last six months of her pregnancy. 30 Kan. App. 2d at 1181-82. We also held that the mother's request that the father stop calling her did not relieve the father of his need to support her during the pregnancy to preserve his ability to later assert his parental rights, noting there is "a significant distinction between [the father] being hindered in efforts to contact [the mother] and being unable to provide support." 30 Kan. App. 2d at 1181. We therefore affirmed the district court's decision. 30 Kan. App. 2d at 1182.

We likewise conclude that the record here supports the district court's findings that Father provided little more than incidental assistance in the six months before C.S.'s birth. It was possible for Father to provide money or other financial help to Mother while she lived in Florida, but he did not do so. The support Father provided while Mother lived in Kansas during her pregnancy was negligible, and his communications—far from providing emotional support—harmed rather than helped Mother during the pregnancy.

In short, we conclude the evidence in the record supports the district court's conclusion that Father failed to provide support to Mother during the last six months of her pregnancy. The district court did not err in terminating Father's parental rights under K.S.A. 2018 Supp. 59-2136(h)(1)(D).

3. *Father's actions following C.S.'s birth are not relevant to whether Father provided support to Mother during the last six months of pregnancy under K.S.A. 2018 Supp. 59-2136(h)(1)(D).*

Lastly, Father argues that he made adequate efforts to support the child after C.S.'s birth and that the district court should have taken those efforts into account when deciding whether to terminate his parental rights. The district court heard testimony regarding Father's efforts both before and after C.S.'s birth, as the Petition for Termination of Parental Rights asserted Father "failed without reasonable cause to provide support for the mother after having knowledge of the pregnancy" *and* "failed to support the child after having knowledge of the child's birth." But the district court based its termination decision on Father's lack of support during pregnancy under K.S.A. 2018 Supp. 59-2136(h)(1)(D) and made no written findings or conclusions regarding Father's efforts after C.S.'s birth.

K.S.A. 2018 Supp. 59-2136(h)(1) lists seven circumstances that justify a district court's termination of a person's parental rights, noting that a court may issue an order terminating those rights if "any" are found by clear and convincing evidence. See K.S.A. 2018 Supp. 59-2136(h)(1)(A)-(G) (disjunctively listing seven circumstances). One of those circumstances is what the district court relied on in reaching its conclusion here— that "the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." K.S.A. 2018 Supp. 59-2136(h)(1)(D). We have concluded the district court's decision is supported by the record. We need not reach the question, therefore, whether termination

17

would have been warranted under a different statutory section (such as whether the father made "reasonable efforts to support or communicate with the child after having knowledge of the child's birth" under K.S.A. 2018 Supp. 59-2136[h][1][C]).

While a court considering whether to terminate a person's parental rights could conceivably use a natural parent's post-birth efforts as a reason to deny efforts to terminate a person's rights if the facts were to warrant such an action, it is not required to do so. Rather, parties should take heed of the cautionary admonition in then-Judge Beier's concurrence in *In re Adoption of M.D.K.*, 30 Kan. App. 2d at 1182-83:

> "An unwed man who learns that his unwed sexual partner is pregnant and intends to carry the pregnancy to term has only one way to ensure he can exercise his parental rights after the birth, regardless of whether the mother intends to exercise hers: He must relinquish possession and control of a part of his property or income to the mother-to-be during the last 6 months of the pregnancy so that she may use the items or money to support herself or prepare for the arrival of the child. He must do this regardless of whether his relationship with the mother-to-be continues or ends. He must do this regardless of whether the mother-to-be is willing to have any type of contact with him whatsoever or to submit to his emotional or physical control in any way. The birth may be the event that triggers a legal *obligation* of support, but it marks the end of the period when *voluntary* support can preserve the father-to-be's right to raise his child. He who hesitates truly is lost . . . .

> "Even in the most acrimonious of situations, a father-to-be can fund a bank account in the mother-to-be's name. He can have property or money delivered to the mother-to-be by a neutral third party. He can—and must—be as creative as necessary in providing material assistance to the mother-to-be during the pregnancy and, the law thus assumes, to the child once it is born. He must not be deterred by the mother-to-be's lack of romantic interest in him, even by her outright hostility. If she justifiably or unjustifiably wants him to stay away, he must respect her wishes but be sure that his support does not remain equally distant."

Because the district court's decision is supported by the record, we need not reach the question of Father's efforts to support C.S. after the child's birth. The district court did not err in terminating Father's parental rights.

Affirmed.