NOT DESIGNATED FOR PUBLICATION

No. 123,301

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of E.S., A Minor Child.

MEMORANDUM OPINION

Appeal from Riley District Court; KEITH L. COLLETT, magistrate judge. Opinion filed July 9, 2021. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Miranda B. Johnson*, of Caffey, Johnson & Ingels, P.A., of Manhattan, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and ISHERWOOD, JJ.

PER CURIAM: E.S.'s stepmother, petitioned the court to allow her to adopt E.S. In support, she alleged that E.S.'s natural mother had failed to assume her parental duties for the two-year period preceding the filing of the petition. As a result, she argued, natural mother's consent to the adoption was unnecessary. In contesting the adoption, natural mother argued that she did the best she could given the circumstances, but that E.S.'s natural father hindered her abilities to assume her parental duties. The district court granted the adoption, and the natural mother appeals.

Because substantial evidence supports the district court's decision that clear and convincing evidence showed Mother refused or failed to assume the duties of a parent for two consecutive years preceding the filing of the petition, we affirm the district court's decision.

1

In July 2018, V.S. (Stepmother) petitioned the court to allow her to adopt her stepchild, E.S. (Child), age 5. In her petition, Stepmother alleged that the consent of the natural mother, A.R. (Mother), was not required because she had failed or refused to assume her parental duties for two consecutive years. Stepmother's husband, R.S. (Father), signed and submitted his consent to the adoption. Included with the petition was a motion to terminate Mother's parental rights.

Mother responded to the petition, denying that she had failed or refused to assume the duties of a parent.

The district court heard the matter in March 2019. Mother testified that at the time of the hearing she had recently gotten out of a rehabilitation program and was living with her parents. She planned to move to one of her family's rental properties soon. Before her time in rehabilitation, Mother spent nine months in the Topeka Correctional Facility after violating her parole. Mother explained that her original sentence was nine months and that she did not receive good-time credit while incarcerated because of several disciplinary write-ups.

As for the history of the case, Mother explained that in 2015 she was living with Father, her three daughters from a prior relationship, and Child. In September 2015, the State filed a Child in Need of Care (CINC) case, and the court temporarily placed all her children with Mother's parents. The CINC case involved an allegation that Mother was using illegal drugs. Ultimately, the court placed Child in Father's custody while the daughters stayed with Mother's parents.

In a custody case revolving around Child, an *ex parte* temporary order issued in May 2016 stated that Mother could have supervised visits with Child through Sunflower

Bridge. The district court issued an order in July 2016, which stated that Mother could have supervised parenting time and that Father could choose the supervising party—the order did not mention Sunflower Bridge. According to Mother, after the district court entered the final order, she called Sunflower Bridge to set up visits. Mother testified that because the order did not specifically say that Sunflower Bridge was the supervising party, she was told that they could not answer many of her questions.

In May 2017, Mother moved to modify the custody arrangement and sought unsupervised parenting time. The court scheduled a hearing in June 2017, but Mother did not attend. The court entered no other orders in the case. According to Mother, the motion never reached a hearing because she was incarcerated and because of a conflict with the judge handling the case. In a response to Mother's motion, Father acknowledged that Mother had tried to contact him at various times. In one attempted contact, which Mother described as an incidental meeting outside Father's home while Mother was visiting a friend who lived near Father, Father pointed a taser at her and told her to get off the property and never come back. Father contested Mother's version of this contact, saying that he did not point a taser at her. Mother also testified that she was unable to speak to Father about the visitations because he changed his phone number.

Mother last saw Child in December 2017 when she visited the child at her parent's house. During that visit, Father said he did not want to discuss the next time Mother could visit Child. At a later point, Mother said that the December visit happened in 2016. Mother then testified that she was in custody from December 2017 to February 2018. At some point between then and the hearing, the court issued a no contact order between Father and Mother. Mother explained that the last time she tried to call and talk to Child, Father reported her for violating the no contact order. There was also a period where Mother did not have contact information for Father.

3

As to her court ordered child support payments, Mother testified that she had tried to make payments but that the Kansas Payment Center did not have her case on file, so she was unable to do so. Nor had she sought to send Father money directly because she was unsure where he lived. Nor did she send it to Father's mother because she was worried about violating court orders by contacting her as an intermediary to Father.

Mother testified that she did purchase cards and gifts for the Child and would give them to her parents so that they could deliver them to Child. She testified that she would not sign them because she did not want to violate any no contact orders. She also wrote Child cards while she was incarcerated, but she sent them to her parents and told them to hold onto them because she was uncertain how to handle it with the pending case.

Mother also discussed her criminal history. She was found guilty of misdemeanor theft in 2016 after stealing from a Walmart. The State charged her with domestic battery in 2016 but that was ultimately dismissed. Also in 2016, the court convicted her of forgery because she was writing checks using Father's checking account. Around the same time, the State charged Mother with theft of Father's vehicle but that was also dismissed. She also had a theft conviction in a separate 2016 case. There was also a charge for violating a protective order, with Father as the victim, which was dismissed. The State charged her with burglary of a motor vehicle and theft in 2017—the case which ultimately landed her in prison. In 2018, the State charged Mother with felony theft of a vehicle.

Mother explained that during this period she was using methamphetamine. According to Mother she started using methamphetamine when she was 18 but stopped when she first became pregnant and started using again around the time of the initial CINC case. As of the hearing, Mother stated that she was 10 months sober, 9 of which she spent in custody. Mother also explained that she had a pending case for alleged burglary or multiple burglaries. Mother testified that she had changed by taking active

4

steps in recovery, staying clean, looking for work, seeking counseling and therapy, taking parenting and domestic classes, and continuing with outpatient therapy.

At the hearing Kathy Ryan, a part-time employee for Sunflower Bridge, explained that one of Sunflower Bridge's offered services is supervising scheduled parental visitation. But before Sunflower Bridge will supervise parental visitation the parents need to participate in an intake procedure. According to Ryan, Father called Sunflower Bridge several times in the preceding three years to set up parenting time with Mother. Ryan explained that his calls were generally to see whether Mother had scheduled her intake "because without her scheduling the intake there really was no point with him scheduling the intake, because we couldn't proceed."

According to Ryan, Mother never scheduled an intake. Nor could Ryan recall Mother ever calling Sunflower Bridge. Ryan explained that Sunflower Bridge generally requires a court order before beginning to work with parents and that the court order needed to list Sunflower Bridge as the supervising party. Still, if both parties agree to voluntary supervised visits with Sunflower Bridge, then a court order is not required. Ryan also noted that one party cannot complete the intake process for another party or set up visitation for the other party without a completed intake.

J.H., the father of Mother's three daughters, also testified at the hearing. J.H. described a time when the maternal grandparents (Grandparents) were supposed to be supervising a visit between Mother and her children, but Grandparents were not present. He also explained that Mother's phone number changed multiple times between 2016 and 2018. As J.H. put it, it seemed like she had a different number every time she would get out of custody. And often the most recent number he would have would not be in service if he called.

5

Father testified that he first called Sunflower Bridge about a week after the temporary orders designating Sunflower Bridge as the supervising party. Father explained that maternal grandmother would watch Child during the day on occasion and that he told Grandparents that Mother could only visit Child with Sunflower Bridge as a supervisor. Even so, Grandparents allowed Child to visit Mother while he was at their house.

Father also testified that during the December visit between Mother and Child he reiterated to Mother that she needed to coordinate future visits through Sunflower Bridge.

Father testified that Mother would call and leave messages that said nothing about Child. If Father called Mother back the number would either be disconnected, or the call would not go through. In March 2017, Mother arrived at Father's home at around 10:30 at night. Father testified that he told Mother, "'Not now'" and shut the door.

Between July 2016 and July 2018, Father remembered only receiving one letter for Child from Mother. Father acknowledged that presents had been left on his porch for Child but said that they were addressed from Grandparents. Father also acknowledged that in February 2018 he moved and did not update the court or Mother with his new address on the advice of his former counsel.

Stepmother testified that in 2017 she picked up Child from daycare and took him to Father's home. Stepmother noticed Mother nearby and got "frazzled" because she was not expecting it. She quickly grabbed Child out of the car, bumping his head in the process, and took him inside. As she did, Mother asked if she could speak with him, but Stepmother said that it was not her choice and went inside.

After hearing the evidence, the court found that any contact between Mother and Child in the relevant period was incidental, including the December 2016 visit. As a

result, the court terminated Mother's parental rights and granted Stepmother's petition for adoption. Mother appeals.

We will add facts as necessary.

ANALYSIS

On appeal, Mother asserts that the district court erred by not considering all relevant circumstances when it terminated her parental rights and by failing to find that Father interfered with her ability to maintain a relationship with E.S. We begin with our standard of review.

A court may terminate a person's parental rights incident to an adoption if it finds, by clear and convincing evidence, that any one of several statutory factors is present. See K.S.A. 2020 Supp. 59-2136(h)(1); see also K.S.A. 2020 Supp. 59-2136(b) (section applicable to father also applicable to mother); *In re Adoption of Baby Girl P.*, 291 Kan. 424, 431, 242 P.3d 1168 (2010). As an appellate court, we view all the evidence in the light most favorable to the prevailing party—here Stepmother—to determine whether there was clear and convincing evidence to support the district court's findings. Clear and convincing evidence means that the truth of the facts asserted is highly probable. We do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of C.L.*, 308 Kan. 1268, 1278-79, 427 P.3d 951 (2018).

*Kansas public policy generally disfavors nonconsensual adoptions unless the parent has failed to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition.*

Generally, public policy favors maintaining the rights of a natural parent in the case of a nonconsensual adoption. See *In re Adoption of G.L.V.*, 286 Kan. 1034, Syl. ¶ 6,

7

190 P.3d 245 (2008). Yet that public policy is not without limit. In a contested stepparent adoption, the district court may terminate a natural parent's parental rights if there is clear and convincing evidence that any one of several factors are present. Relevant here, the natural parent's parental rights may be terminated if the parent "has failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition." K.S.A. 2020 Supp. 59-2136(h)(1)(G). When terminating a parent's parental rights, the district court "(A) [s]hall consider all of the relevant surrounding circumstances; and (B) may disregard incidental visitations, contacts, communications or contributions." K.S.A. 2020 Supp. 59-2136(h)(2). Our court has recognized the distinction between being hindered in parenting a child as opposed to being unable to provide support. See *In re Adoption of M.D.K.*, 30 Kan. App. 2d 1176, 1180-81, 58 P.3d 745 (2002) (There is "a significant distinction between [a parent] being hindered in efforts to contact [another parent] and being unable to provide support.").

Mother argues that she has not willfully failed to assume her parental duties but that Father thwarted her attempts. For support, Mother cites *In re Adoption of F.A.R.*, 242 Kan. 231, 747 P.2d 145 (1987). So we turn to the facts and findings in that case and its application to Mother's circumstances here.

In *F.A.R.*, the natural father was imprisoned, and the stepfather filed for adoption of two children arguing that natural father's consent was not required because he failed to assume his parental duties for two consecutive years. Natural father was facing several decades in custody at the time. He was not paying child support. Natural father was entitled to reasonable visitations and later sought specific visitation rights. The district court, in a different case, granted specific visitation as to one of the children. Even so, after the third visit the child returned visibly upset and did not want to visit the natural father again. The mother did not force the child to go to visitation, and the court discontinued visitations.

8

Ultimately, the district court denied the stepfather's petition finding that the natural mother's actions constituted interference with the natural father's parental rights. In doing so, the court noted that father sought to expand his visitation rights but that his attempts were denied, that mother did not try to contact natural father and, at times, natural father did not know the whereabouts of the children, that the mother returned a proffered support payment, and that natural father's last contact related to his children was a photo of the children with a note asking him to back off on his attempts to contact the mother and children.

Stepfather appealed, seeking reversal of the district court's ruling. The Kansas Supreme Court denied the appeal, finding that, when viewing the evidence in a light most favorable to the prevailing party—the natural father—there was enough evidence to support the district court's ruling. 242 Kan. at 237, 239-40. In doing so, the court found that the natural father tried to learn the whereabouts of his children, wrote letters to the mother but received no response, sought to make a support payment which mother rejected even though he was not under a court order to provide payment, and that mother returned his attempted written communications to him. When viewing the evidence in a light most favorable to the natural father, the Kansas Supreme Court held that the trial court's conclusion was supported by the evidence. 242 Kan. at 239-40.

The question is the same here—was there sufficient evidence, when viewing the evidence in a light most favorable to Stepmother, to find that Mother failed to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition. When viewing the evidence in that light, the facts are significantly different than those in *F.A.R.* and we have no hesitation affirming the district court's decision.

9

*There was substantial evidence to show that Mother refused or failed to assume the duties of a parent for two consecutive years preceding the filing of the petition.*

Stepmother filed her petition in July 2018, so the relevant period was July 2016 to July 2018. In that period, there was very little contact between Mother and Child, and as the court noted any of that contact could be considered incidental. The longest visitation happened near Christmas in 2016 where Mother and Child spent a couple of hours together. Beyond that, there was some incidental contact between Mother and Child when Mother would visit while maternal grandmother was babysitting Child. Father did not know about, or sanction, those visits.

Mother argues that this incidental contact stems from Father interfering with her ability to visit Child. She points to the protection orders in place between her and Father, Father changing his phone number and moving without giving her updated information, and Father refusing to speak with her as evidence that Father interfered with her ability to visit Child. And while she raises a valid point—contact between Father and Mother was difficult—it was not enough to sway the district court.

While there were protection orders in place between Father and Mother, the orders allowed Mother to communicate with Father about Child. Yet it seemed that whenever Mother sought to communicate with Father, she did not mention that she was calling about Child. Father testified that when he tried to call Mother back the call would not go through, or the number would be disconnected. At one point, Mother knocked on Father's door late at night and he just told her, "'Not now.'" As for Mother's argument that Father changed his phone number and moved, that occurred in February 2018, late in the relevant period. During that period, Father remained represented by counsel, although Mother notes that she tried to contact Father's counsel but did not receive an answer back.

Mother also argues that she was unable to schedule visitation with Child through Sunflower Bridge because there was never a final court order designating Sunflower Bridge as the supervising party. But Ryan testified that Sunflower Bridge would supervise for two consenting parties without a court order but that Mother never called to complete an intake form.

Similarly, there was an issue with the child support payments not being set up through the Kansas Payment Center. Mother did not provide any child support payments throughout the relevant period. As the district court noted, the August 2016 journal entry contained the relevant information regarding child support payments and the Kansas Payment Center even if the Kansas Payment Center account were not set up. Mother did not seek to setup an account with the Kansas Payment Center or attempt to have her attorney do so. Beyond that, there were not any attempted direct payments from Mother to Father or any indication that Mother was holding money back so she could pay a larger sum once an account was created.

Mother faced roadblocks in supporting and visiting Child. But from the evidence presented to the district court the roadblocks were not absolute bars. As we have noted, there is a significant difference between being hindered in supporting one's child and being unable to provide support. See *In re of Adoption of C.S.*, 57 Kan. App. 2d 352, 364-65, 452 P.3d 858 (2019) (mother's request that father stop calling did not relieve father of need to provide financial support). Likewise, there is a difference in being hindered while trying to set up visitation time and being unable to do so entirely. While Mother faced difficulties in providing parental care, she was not absolutely barred from doing so.

When viewing the district court's decision in a light most favorable to Stepmother, there was substantial evidence to support the district court's decision that clear and convincing evidence existed that showed that Mother refused or failed to assume the duties of a parent for two consecutive years preceding the filing of the petition. See *In re*

11

*Adoption of C.L.*, 308 Kan. at 1278-79. The district court did not err in terminating Mother's parental rights and granting Stepmother's petition for adoption.

Affirmed.